UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
COBALT MULTIFAMILY INVESTORS I,
LLC et al.,                           :

                 Plaintiffs,          :      REPORT & RECOMMENDATION

                 -against-            :      06 Civ. 5738 (KMW)(MHD)

BRIDGE CAPITAL (USVI), LLC and        :
EASTERN CAPITAL GROUP, LLC,
                                      :
                 Defendants.
--------------------------------x

TO THE HONORABLE KIMBA M. WOOD, U.S.D.J.:


        Plaintiff Cobalt Multifamily Investors I, LLC, and its related

defunct entities (collectively "the Cobalt entities"), all of which

are represented by a court-appointed receiver, have moved to

enforce a court-approved settlement agreement entered into in this

case with defendant Eastern Capital Group, LLC ("Eastern"). In its

turn Eastern has moved to set aside the settlement on various

theories, all of which are linked to the common theme that it has

not realized the consideration contemplated by the agreement. For

the reasons that follow, we recommend that plaintiffs' motion to

enforce the agreement be granted and that defendant's motion to set

it aside be denied.


A. Background


        To place this motion in context, we revisit some events that

1

preceded the filing of plaintiff's lawsuit, and the circumstances
that led to its settlement and the current motions.

## 1. The Fate of the Cobalt Entities

Cobalt Multifamily Investors and a number of related entities
were allegedly run by two previously convicted felons, named Mark
J. Shapiro and Irving J. Stitsky, with the assistance of a third
principal, named William B. Foster. According to a complaint filed
by the Securities and Exchange Commission against them and the
Cobalt entities in early 2006 (SEC v. Cobalt, 06 Civ. 2360 (KMW)),
these individuals contrived to obtain funds from a large number of
investors based on materially false information about their
backgrounds, the performance of the Cobalt entities, and what they
intended to do with the money by way of real estate investing. (SEC
Compl. ¶¶ 7-12, 18-35). The Commission alleged that much of the
more than $15 million raised in this manner was either invested in
failing real properties or misappropriated by the principals. (Id.
¶¶ 18, 20, 27, 36-39). With the Cobalt entities essentially defunct
and the three principals all facing criminal charges, the SEC
commenced its lawsuit in March 2006 and immediately obtained a
temporary restraining order against further disbursement of
corporate assets as well as the provisional appointment of a
receiver. (See March 28, 2006 Order to Show Cause, Temporary

2

Restraining Order & Order Freezing Assets and Granting Other Relief). The court subsequently entered a preliminary injunction and appointed the receiver on a more permanent basis. (See July 20, 2006 Order; see also May 4, 2006 Tr. at 122; July 20, 2007 Tr. at 3-12).

## 2. The Purchase of the Madison

In 2005, while the Cobalt entities were still functioning, their principals arranged, through a related entity known as Simone Beach Club West, LLC ("Simone"), for the purchase of two apartment buildings, located, respectively, at 304 and 312 Ocean Drive, Miami Beach (collectively "the Madison"). The purchase price for these buildings was approximately $5 million. (Declaration of Leonard Weintraub, Esq., executed March 14, 2007, at ¶ 3(A)). In connection with that purchase, Simone borrowed $4.3 million from Eastern, secured by a first mortgage on the property. (Id. ¶ 3(A) & Ex. A at First and Second Whereas Clauses).[1] Among other provisions, the loan agreement required that Simone obtain insurance on the Madison for the benefit of Eastern and, in the event of damage to or

---

[1] Co-defendant Bridge Capital Group ("Bridge") later received a second mortgage on the same property to secure a later loan to Simone. (See Compl. ¶¶ 52-54; Stipulation and Order of Dismissal With Prejudice With Respect to Bridge Capital (USVI) LLL at Fifth Whereas Clause, dated Jan. 3, 2007; Weintraub Decl., Ex. B at ¶ 2).

destruction of the property, that it turn over to Eastern certain
specified insurance proceeds. The agreement also authorized Eastern
to maintain a lien on any insurance policy and its proceeds to
ensure the satisfaction of these conditions. (Id. ¶ 3(B) & Ex. A at
Third Whereas Clause).

On or about May 26, 2005 Simone obtained an insurance policy
from Citizens Property Insurance Corporation ("Citizens") to cover
windstorm damage for the Madison. (Id. ¶ 3(E) & Ex. A at Seventh
Whereas Clause). Consistent with the loan agreement, the policy
named Eastern as a loss payee. (Id. ¶ 3(E) & Ex. A at Seventh
Whereas Clause).

3. The Insurance Litigation

On or about October 24, 2005 Hurricane Wilma passed through
Dade County, and substantially destroyed the building at 312 Ocean
Drive. In the wake of this event, the City of Miami issued an order
requiring the demolition of that structure, and it was accordingly
dismantled. (Id. ¶ 3(F) & Ex. A at Eighth Whereas Clause).

Citizens declined to pay on the policy, however, for reasons
not noted in the current motion papers. As a consequence, in late
2006 the receiver for the Cobalt entities commenced a lawsuit in

4

the County Court for the Eleventh Judicial Circuit in Dade County, asserting a claim against Citizens under the insurance policy. The suit sought recovery on behalf of the Cobalt entities. (Weintraub Decl. ¶ 3(G) & Ex. A at Ninth Whereas Clause).

## 4. The Foreclosure Action

In the meantime, Simone had defaulted on its loan from Eastern. As a result, on March 24, 2006 Eastern commenced a foreclosure action in the County Court for the 11th Judicial Circuit in Dade County. (Id. ¶ 3(c) & Ex. A at Fourth Whereas Clause). That proceeding culminated in the entry on November 5, 2006 of a summary final judgment of foreclosure and sale which authorized foreclosure and sale on behalf of Eastern's first mortgage and Bridge's second mortgage unless the amounts owing to Eastern and Bridge were paid by December 14, 2006. The judgment determined that Eastern was then owed $4.3 million in principal and $1,002,984.10 in accrued interest, or a total of $5,302,984.90, together with legal fees incurred in the foreclosure action. It further determined that Bridge was owed $2.75 million in principal and $362,083.40 in accrued interest. (Weintraub ¶ 3(D) & Ex. B at ¶¶ 1-4).[2]

---

[2] The foreclosure court stated that the foreclosure judgment was being entered solely to permit foreclosure and sale of the Madison and was without prejudice to any claims that the receiver

5. The Current Lawsuit

In connection with the receiver's obligation to marshal the assets of the Cobalt estate for the benefit of the defrauded shareholders as well as potential creditors of the Cobalt entities, he also filed the current lawsuit against Eastern and Bridge in this court on July 31, 2006. In substance, he contended that Eastern and Bridge had both extended loans to the Cobalt entities and taken security interests from those corporations with the knowledge or constructive knowledge that the principals of the Cobalt entities were looting the companies. He therefore asserted claims that the two defendants had aided the Cobalt principals in carrying out their fraudulent activities and in breaching their fiduciary obligations to the Cobalt shareholders, and that the defendants had also engaged in fraudulent conveyances of corporate property. (Compl. ¶¶ 44-84).

Bridge responded to the complaint by filing a motion to dismiss and for sanctions. By agreement with the receiver, Eastern never responded to the complaint. (E.g., Stipulation and Order dated Nov. 29, 2006). Bridge's motion was never adjudicated because it later settled with the receiver. (See Jan. 3, 2007 Stipulation and Order of Dismissal With Prejudice; Jan. 24, 2007 Stipulation

might have against Eastern or Bridge. (Id., Ex. B at ¶ 9).

6

and Order of Dismissal With Prejudice).

## 6. The Settlement

At some point in the latter part of 2006 the receiver and Eastern entered into settlement discussions, with a view to resolving the receiver's lawsuit in this court and addressing the foreclosure proceeding in Dade County as well. Those discussions culminated in a stipulation of settlement and order of dismissal signed by the parties on or around December 7, 2007 and "so ordered" by the court here on December 11, 2007. (Weintraub Decl. ¶¶ 2, 4-5 & Ex. A, Stipulation of Settlement & Order of Dismissal Without Prejudice, signed Dec. 7, 2007, filed Dec. 13, 2007).

Under the terms of the stipulation, (1) the receiver agreed to the dismissal of the Cobalt entities' lawsuit as against Eastern[3]; (2) Eastern agreed to pay the receiver a total of $125,000.00 in three installments, commencing January 15, 2007, then on February 28, 2007, and concluding May 1, 2007; (3) the receiver agreed that in the event of a recovery by the Cobalt entities in the insurance

---

[3] As noted, the receiver later settled his claims in this lawsuit as against Bridge. The settlement involved the release of $380,000.00 in escrowed funds to Bridge, with $20,000.00 going to the receiver, and an agreement to reduce any remaining claims that Bridge might have against the Cobalt entities by $40,000.00. (See Jan. 24, 2007 Stipulation and Order of Dismissal With Prejudice).

7

litigation against Citizens, they would pay Eastern one-half of the funds recovered, up to the amount of any foreclosure deficiency, that is, any shortfall between the proceeds received by Eastern from the foreclosure sale and the amount owed it under the foreclosure judgment; (4) to assist in this endeavor, Eastern agreed to assign to the receiver all rights that it might have to the Citizens insurance policy and any insurance proceeds under that policy, and it further represented that it was "the sole and lawful owner of" those rights; and (5) in contemplation of the forthcoming foreclosure sale, Eastern agreed that in the event of a deficiency between the amount it obtained from that sale and the amount it was owed under the foreclosure judgment, it would not file any suit or claim to recover that deficiency from the receiver or from Simone. (Weintraub Decl. ¶ 5(A)-(C) & Ex. A at ¶¶ 1-3, 6). The stipulation also specified that, for purposes of determining how much of any recovery by the receiver from Citizens would be due to Eastern, the measure of the deficiency would be the difference between the amount of the foreclosure judgment and "the highest *bona fide* bid for the Madison (other than a 'credit bid' by Eastern)." (Id., Ex. A at ¶ 3)(emphasis in original).

### 7. Post-Settlement Events

The foreclosure sale was scheduled for December 14, 2006. Just

8

prior to that sale -- on either December 13 or 14, 2006[4] -- the foreclosure court ruled that the right to pursue the insurance proceeds allegedly due from Citizens would run with the title to the Madison itself. (Declaration of Robert Cayre, executed March 28, 2007, at ¶ 17; Weintraub Supp. Decl. ¶ 5). Thus, whoever received title to the property at the sale would, under the terms of the foreclosure judgment, also receive any rights under the insurance policy. That ruling was consistent with the terms of the foreclosure judgment, which directed that, unless the liens of Eastern and Bridge were fully satisfied by December 14, 2006, "the property" -- which it defined as both "real property" and "personal property" -- was to be sold. (Weintraub Decl., Ex. B at ¶¶ 3-4). In specifying what was encompassed in the "personal property" to be sold, the judgment recited that it included "all leases and other agreements, including, without limitation, insurance contracts pertaining to the ownership . . . of all or any part of the Real Property . . . [and] all proceeds of the conversion . . . of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance . . . awards." (Id., Ex. B at ¶ 3).

The foreclosure sale took place on December 14, 2006, as

---

[4] The parties disagree as to the date. (Compare Supplemental Declaration of Leonard Weintraub, Esq., executed April 4, 2007, at ¶ 5 with Eastern's Reply Memorandum of Law at 7).

9

scheduled. (Id. ¶ 7). At the sale, Bridge made the highest bid, totaling $4,910,000.00 and thus took title to the property, including the insurance policy and the right to pursue a recovery from Citizens. (Id.). The proceeds paid by Bridge at the sale went to Eastern in partial satisfaction of Simone's obligation to Eastern under the first mortgage. (Id. ¶ 8).

Although Eastern was required by its settlement agreement in this case to make payments to the receiver of $41,667.00 by January 15, 2007 and another $41,666.00 by February 28, 2007, it failed to do so. (Weintraub Decl. ¶¶ 9-10). Counsel for the receiver followed up by e-mails on February 8 and 12, 2007, noting Eastern's default and warning that, absent a response, the receiver would seek relief in court. (Id. ¶ 10 & Exs. C-D). He received no formal response, and therefore, on or about March 14, 2007, he filed a motion to enforce the settlement stipulation. That in turn triggered a motion by Eastern to set aside the stipulation because, it said, the ruling of the foreclosure court assertedly precluded the receiver from litigating the insurance claim against Citizens, thereby depriving Eastern of an essential part of the consideration that it was to receive under the settlement agreement. (Eastern's Memorandum of Law at 6-12).

10

ANALYSIS

The receiver's motion is straightforward and not subject to any factual dispute. There is no question that under the terms of the settlement stipulation Eastern was obligated to make certain specified monetary payments to the receiver in January and February 2007. There is equally no dispute that Eastern failed to do so. Hence, unless the settlement stipulation is set aside, there is no question that the receiver is entitled to relief on his motion.

The determinative question, then, on both of these motions is whether Eastern has justified excusing it from carrying out its payment obligations under the agreement. In support of its motion for such relief, Eastern presses four discernible though related arguments, all premised on the fact that it will not able to recover anything from the insurance litigation because the right to such proceeds under the policy went, with title to the Madison, to co-defendant Bridge. Specifically, Eastern asserts that this circumstance reflects (1) a failure of consideration, (2) a mutual mistake, (3) a unilateral mistake, or (4) possibly fraudulent inducement by the receiver. (Id. at 6-12). As to at least the last point, Eastern also suggests that the court may have to conduct an evidentiary hearing to determine the knowledge and intent of the receiver (or his attorney) at the time of the negotiation and

11

execution of the settlement stipulation. (Id. at 5 n.2).

We conclude that all of Eastern's theories are fatally flawed, and, further, that there is no reason whatsoever to conduct an evidentiary hearing. Accordingly, its motion to vacate the settlement stipulation should be denied and, of necessity, the receiver's motion to enforce the settlement should be granted.[5]

## 1. Failure of Consideration

In seeking rescission based on failure of consideration, Eastern contends, in substance, that obtaining a share of the insurance proceeds was the central benefit that it sought from the settlement agreement with the receiver, and that the ruling of the foreclosure court deprived it of that benefit. Accordingly, it argues, the agreement suffers from a failure of consideration, and hence should be set aside. (Eastern's Mem. 6-9). This argument fails at multiple points.

The agreement on its face, and the accompanying undisputed record, demonstrate that Eastern received substantial consideration, indeed, all the consideration for which it

---

[5] The settlement stipulation specifies that New York law governs its interpretation or enforcement. (Weintraub Decl., Ex. A at ¶ 11).

12

bargained. As part of the settlement, the receiver agreed to dismiss the claims that he had asserted against Eastern in this case in exchange for $125,000.00. Those claims sought recovery of many millions of dollars from Eastern as well as from Bridge (see, e.g., Compl. at ¶¶ 44, 48-55, 58, 61, 66, 73, 79, 85), and their voluntary dismissal was plainly valuable consideration to Eastern. Moreover, although Eastern now insists that the claims were meritless (e.g., Eastern's Mem. 3; Eastern's Reply Mem. 7), it chose not to test the confidence it now expresses, opting instead to resolve the matter rather than wait for a determination of a motion to dismiss (or, if that motion were denied, a later result at the conclusion of litigation). In short, by settling, it avoiding both the risk of an adverse result and the time and expense of any further litigation of the receiver's claims.

The settlement provided an additional significant benefit to Eastern, which its own representative inferentially admits. Eastern was vitally interested in ensuring not only that the foreclosure sale proceed as scheduled, but that it obtain prompt access to the proceeds if another buyer ultimately ended up with the property. Eastern's concerns in this respect were heightened by the threat of the receiver to seek a court order either delaying the sale or placing the sales proceeds in escrow. (See Weintraub Decl. ¶ 6). Thus, in the declaration of Robert Cayre, a managing partner of

13

Eastern, we find the following admission:

> It should be noted that even though this Court approved
> Eastern Capital's pursuit of the foreclosure judgment,
> the Receiver continued to interfere with Eastern
> Capital's ability to move toward a swift foreclosure
> judgment. In fact, Eastern Capital's decision to enter
> into the Settlement Stipulation was significantly
> influenced as a result of the Receiver's continued
> threats to attempt to either postpone the foreclosure
> sale or seek to receive all sums collected in
> connection therewith.

(Cayre Decl. ¶ 3 n.3). In short, Eastern derived a further
"significant[]" benefit from the settlement by ensuring that there
would be no interference with, or postponement of, either the sale
or its ability to obtain the proceeds of that sale if another party
purchased the property.

    The substantiality of these realized benefits is self-evident.
Eastern avoided potential liability and litigation expenses that
could have totaled many millions of dollars and was assured that it
would obtain prompt payment of the sale proceeds, which ultimately
totaled more than $4.9 million. Moreover, these were the only
concrete benefits guaranteed by the settlement agreement as
drafted, since the one remaining part of the consideration -- a
possible share in insurance proceeds if any were ever obtained --
was plainly conditioned on events beyond the control of the
parties. Necessarily, then, it cannot be said that there was a
failure of consideration that might justify rescission of the

settlement agreement. See, e.g., Sherman v. Hallmark, 181 Misc. 2d
889, 894, 695 N.Y.S.2d 508, 512 (N.Y. Civ. Ct. 1999)("[R]escission
is permitted where there has been a failure of consideration [but
it must at least be] a failure which leaves the subject of the
contract substantially different from what was contracted for . .
. .")(citing Callanan v. Keeseville, A.C. & L.C.R., 199 N.Y. 268,
284, 92 N.E. 747, 752 (1910))(internal quotation marks omitted).

Apart from these realized benefits, the settlement stipulation
gave Eastern only a conditional benefit, that is, a share of the
insurance proceeds, if any, that might be obtained by the receiver
in his nascent lawsuit against Citizens under the wind-damage
policy issued to Simone in connection with its loan agreement with
Eastern. Under the settlement agreement, and in light of the
results of the foreclosure sale, the potential benefit of that
provision was capped at less than $400,000.00.[6] It is the purported
loss of this benefit that Eastern cites as the exclusive basis for
rescission.

As we have noted, the substantiality of the guaranteed
benefits realized by Eastern precludes a finding that there was a
failure of consideration. In any event, the fate of Eastern's hopes

---

[6] This represents the difference between the foreclosure sale
proceeds and the amount owed to Eastern by Simone under the terms
of the foreclosure judgment. (See Cayre Decl. ¶ 16).

15

for an insurance recovery cannot be deemed a failure of
consideration.

The pertinent benefit defined by the settlement agreement was
the inchoate right to a share of insurance proceeds if such
proceeds were realized and if there was a deficiency arising from
the foreclosure sale. Thus, all that Eastern received under the
agreement was the possibility of a payment conditioned upon two
events over which the receiver had no determinative control.

The fact that the contractually defined conditions for a
payment were not realized through no fault of the would-be payor
does not demonstrate a basis for rescission. "It is well settled
that, when a man acts in consideration of a conditional promise, if
he gets the promise he gets all that he is entitled to by his act,
and if, as events turn out, the condition is not satisfied, and the
promise calls for no performance, there is no failure of
consideration." Independent Energy Corp. v. Trigen Energy Corp.,
944 F. Supp. 1184, 1199 (S.D.N.Y. 1996)(quotation marks and
citation omitted). See also Travelers Indem. Co. of Illinois v. CDL
Hotels USA, Inc., 322 F. Supp.2d 482, 496 (S.D.N.Y. 2004)
("[N]either reformation or rescission is permitted if the parties
entered an agreement based upon uncertain or contingent events and
the claim is based on mistake as to the outcome of such an

16

event.") (citations omitted) .

The absence of any insurance payout to the receiver or to Eastern was a risk incorporated into the settlement agreement, since there was no assurance that the receiver would obtain anything in his insurance suit, either by judgment or by settlement. This risk was realized as a result of (a) the terms of the foreclosure judgment obtained by Eastern before the settlement, (2) the foreordained ruling of the foreclosure court that the judgment meant, as it said, that the purchaser of the property would inherit the insurance policy and any claims under it and (3) the fact that Bridge made the highest bid at the foreclosure sale and thus obtained title to the property. In short, Eastern got what it bargained for -- the opportunity to obtain some payment if the receiver were able to derive funds from his insurance suit.

Furthermore, the factual record reflects that the loss of any possibility of such an insurance recovery not only was not the fault of the receiver, but was in fact attributable to decisions made by Eastern. Eastern was on clear notice before the foreclosure sale that if it did not obtain the property by bidding at the auction, it and the receiver would lose the insurance claim. This was plain from the language of the foreclosure judgment and still more plain when the foreclosure judge specifically so ruled before

17

the sale. Despite this notice, Eastern chose to let the property go to Bridge for $4.91 million rather than seek to outbid its co-defendant. That was a choice that Eastern made with knowledge of the consequences, and its decision to proceed in this fashion also precludes any claim for failure of consideration.

As the New York courts have noted, "[f]ailure of consideration exists wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed quid pro quo for that performance." Fugelsang v. Fugelsang, 131 A.D.2d 810, 811, 517 N.Y.S.2d 176, 177 (2d Dep't 1987)(emphasis added). Although Eastern failed to receive whatever monetary benefit it thought that it might obtain from the insurance litigation by virtue of the purchase of the property by Bridge, Eastern was responsible for that consequence in view of its failure to bid up the property.

Moreover, this failure -- entirely unmentioned by Eastern in its papers -- is particularly notable in view of the uncontested testimony of the receiver's negotiating attorney, who reports that Eastern's representative stated during the discussions preceding execution of the settlement stipulation that Eastern would "credit bid" the Madison, that is, it would bid up to the full amount of its foreclosure judgment, a figure in excess of $5.3 million.

18

(Weintraub Supp. Decl. ¶ 7).[7] Eastern failed to pursue such a bid, and it offers no basis to infer that it was, for some reason, unable to do so. In short, the failure of Eastern to realize on a conditional benefit embodied in the settlement agreement was attributable to its own decision, which, we must infer, it made for its own business purposes. It must of course accept the consequences of that decision.[8]

Finally, we note that to impose rescission at this stage would be highly inequitable. Eastern has realized the guaranteed benefits of the settlement agreement, including the avoidance of any delay or other interference with its receipt of the foreclosure proceeds. By the same token the receiver has lost the value of its potential ability to either delay the sale or segregate the sale proceeds. Hence, while one aspect of the status quo ante could be restored -- that is, the re-institution of the receiver's claims against Eastern -- another major part of that prior status quo can no longer be restored. Under these circumstances, it would be unfair

---

[7] As noted, the settlement agreement itself contemplated such an outcome, defining the amount of the deficiency as the difference between the foreclosure judgment and the highest bona fide bid except for a credit bid by Eastern. (Weintraub Decl., Ex. A at ¶ 3).

[8] It also bears mention that Eastern chose not to appeal from the decision of the foreclosure court, thus suggesting that it recognized the validity of the court's ruling on this issue. Again, this was a choice made by Eastern.

19

to the receiver to vacate the settlement.

## 2. Mutual Mistake

Eastern alternatively proposes that the settlement stipulation should be vacated for mutual mistake. This argument fails, if for no other reason, because Eastern does not identify any mistake by the parties.

Implicit in Eastern's argument is the unuttered notion that at the time that the parties entered into the settlement agreement, they both believed, albeit mistakenly, that the receiver would be permitted to pursue the insurance claim even if an outsider purchased the Madison at the foreclosure sale. This fails for several reasons.

First, Eastern offers no evidence that its own representatives believed this to be the case, and that evidentiary omission is particularly damning since the language of the foreclosure judgment -- which was entered more than a month before the execution of the settlement agreement -- says the contrary. Second, Eastern offers no evidence that the receiver harbored the same mistaken belief.

Third, the evidence suggests no such mistake by either party.

20

As noted, the foreclosure judgment was quite clear on this point. Moreover, the fact that Eastern assured the receiver that it was ready to credit bid the property at the sale -- which could well have led to its being the high bidder -- suggests that both parties understood that the insurance benefits reflected in the agreement were only attainable if Eastern obtained the property, and that if it did so, the issue of possible loss of the insurance claim by virtue of the foreclosure sale would be mooted.

Fourth, a mutual mistake must be as to a fact, and not as to the legal consequences of the contract into which the parties are entering. See, e.g., Jossel v. Meyers, 212 A.D.2d 55, 57, 629 N.Y.S.2d 9, 10-11 (1st Dep't 1995). The only mistake that Eastern may be inferentially suggesting[9] concerns the legal consequences of the deal that the parties made to settle this lawsuit, that is, an assumption that they could retain the rights to the insurance proceeds notwithstanding the results of the foreclosure sale. Such a mistake, if it were made, would not permit rescission, since it is not a mistake of fact. See, e.g., Travelers Indem., 322 F. Supp. 2d at 497 ("[M]istake means being in error in one's belief as to what the contract states.")(quoting AMEX Assurance Co. V. Caripides, 316 F.3d 154, 161 (2d Cir. 2003)); Gonzalez v. Green, 14

---

[9] As noted, Eastern never actually identifies the purported mistake, much less offers evidence to demonstrate the existence of a mistaken belief.

Misc. 2d 641, 648, 831 N.Y.S.2d 856, 861 (N.Y. Sup. Ct. 2006)(misunderstanding of legal effect not basis for rescission where parties knew and designed terms of contract)(citations omitted). Cf. Gimbels Bros. v. Brook Shopping Ctrs., 118 A.D.2d 532, 535-36, 199 N.Y.S.2d 435, 439 (2d Dep't 1986)(equitable relief unavailable where party seeking such relief exhibited lack of diligence in determining its legal obligations under the contract).

Fifth, rescission is only available where the mistake goes to the heart of the contract and is an error that does not involve the mistaken party simply ignoring, and thus bearing, a knowable risk. See, e.g., Copland v. Nathaniel, 164 Misc. 2d 507, 511, 624 N.Y.S.2d 514, 518 (N.Y. Sup. Ct. 1995)(citations omitted). The purported error in this case does not go to the heart of the contract, that is, it is not so "material and fundamental . . . as to defeat the object of the contract." Id. at 510, 624 N.Y.S.2d at 518. As noted, Eastern obtained all of the considerable guaranteed benefits provided by the agreement. Moreover, its purported misunderstanding as to the need to obtain title to the property to preserve a possibility of an insurance recovery seems not to have been essential at the time in view of its stated intention to credit bid the property at the sale, which would likely have avoided the problem of a potential loss of insurance rights. Furthermore, since Eastern knew or should have known that

22

requirement before the sale and nonetheless chose not to exceed the bid of Bridge, we can fairly infer, based on its course of conduct, that the lost opportunity to have the receiver pursue the insurance case was not central to Eastern's view of the agreement.

In any event, when the settlement was agreed to, the risk in question was certainly knowable to Eastern in view of the language of the judgment, and it must be charged with knowledge of that language since obviously its own attorneys had read it (if they in fact did not draft it). "[A]bsent fraud, [the applicant for rescission] cannot proceed in conscious ignorance and then seek rescission after having implicitly taken the risk" that the facts would turn out as the party should have known they would. Id. at 511, 624 N.Y.S.2d at 519.

3. Unilateral Mistake

Eastern's alternative theory of unilateral mistake fails for reasons already noted, since it never demonstrates a mistake, much less an error of fact and one concerning which it was not fully on notice of the actual facts. In addition, a unilateral mistake is not a basis for rescission absent fraud, see, e.g., Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)(citation omitted); Barclay Arms, Inc. v. Barclay Arms Ass'n, 74 N.Y.2d 644,

646, 542 N.Y.S.2d 512, 513-14 (1989), and Eastern offers no evidence of any fraud on the part of the receiver.

## 4. Fraudulent Inducement

Finally, Eastern refers to the possibility of a claim for fraudulent inducement, and further suggests that the court might need to conduct an evidentiary hearing to determine what the receiver or his negotiators knew or intended during the course of negotiations. To prevail on a claim of fraudulent inducement, a party must demonstrate (1) that the defendant made a false representation, (2) that the defendant was aware of, or recklessly disregarded, its falsity, (3) that he acted with intent to mislead or to induce the plaintiff to act, and (4) that the plaintiff relied on the misrepresentation to his detriment. E.q., Aetna Cas. & Surety Co. v. Aniero Concrete Co., 404 F.3d 566, 580 (2d Cvir. 2005)(citations omitted). Eastern is entirely silent, however, as to what representations or statements were made by the receiver or his representatives that Eastern believes were false, much less knowingly false and material and relied upon by Eastern. (See Eastern's Mem. 11-12). Its silence on these obvious points is fatal to its unarticulated claim.

As we well know, when a party seeks to allege fraud in a

pleading, Fed. R. Civ. P. 9(b) imposes a heightened standard of specificity on the pleader. In this case, Eastern offers no factual allegations whatsoever -- specific or otherwise -- much less any evidence, and we cannot even imagine what facts might form the basis for a viable fraud claim in this context, where the terms of the foreclosure judgment were known to both sides.

Plainly Eastern's argument is a non-starter. Moreover, its suggestion about the need for an evidentiary hearing (see Eastern's Mem. 11 n.10; Eastern's Reply Mem. 6 n.4) is misguided, since a hearing would be appropriate only if there were disputed issues as to the facts material to a claim, and in this case Eastern has not even proffered any facts, much less demonstrated a viable dispute about them.

CONCLUSION

For the reasons noted, we recommend that plaintiff's motion to enforce the settlement stipulation be granted and that Eastern's motion to set it aside be denied. Under the terms of the stipulation, the receiver is entitled to payment of the full $125,000.00, together with interest under N.Y. C.P.L.R. §§ 5001, 5004. In addition, the stipulation provides that if Eastern fails to make the required payments, the receiver will be entitled, on

behalf of plaintiffs, to "reasonable attorneys' fees and costs incurred thereby." (Weintraub Decl., Ex. A at ¶ 1). Hence the receiver should also receive a fee and cost award. He has not yet documented his attorney fees yet, although he refers to them (Weintraub Supp. Decl. ¶ 17), choosing instead to await a final decision on these motions. In the event that his enforcement motion is granted, he should be directed to serve and file an affidavit with contemporaneous time records within ten days thereafter. As for prejudgment interest, it should run at the statutory rate of nine percent, with an appropriate starting date of February 12, 2007, the date of the receiver's formal, and unanswered, demand for payment. (Weintraub Decl., Ex. D).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Kimba M. Wood, Room 1610, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon

26

v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).


Dated:  New York, New York
        August 15, 2007


                                        _____
                                        MICHAEL H. DOLINGER
                                        UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Report and Recommendation have been mailed today to:

Leonard Weintraub, Esq.
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020

Richard M. Resnik, Esq.
Seyfarth & Shaw LLP
1270 Avenue of the Americas
New York, New York 10020-1801